SCOTT U. S. A., INC., a corporation, Plaintiff,

v.

Robert J. McDONALD, Defendant.

Civ. No. 1-66-13.

United States District Court, D. Idaho.

July 7, 1970.

Lloyd J. Webb, Rayborn, Rayborn, Webb & Pike, Twin Falls, Idaho, Robert J. Henry, Schapp & Hatch, San Francisco, Cal., for plaintiff.

James B. Donart, Donart & Donart, Weiser, Idaho, Seed, Berry & Dowrey, Seattle, Wash., for defendant.

McNICHOLS, District Judge.

This matter is again before the court upon order from the Court of Appeals

for the Ninth Circuit remanding the cause for further proceedings in accordance with that order and the teachings of Lear, Inc. v. Adkins, 395 U.S. 653, 89 S.Ct. 1902, 23 L.Ed.2d 610 (1969). In *Lear* the Supreme Court held that a licensee under a patent was not estopped or otherwise made incompetent to attack the validity of the patent. This court had, at the close of the trial of this matter, held the plaintiff, as such licensee under defendant's patent, estopped to deny the validity of the patent and had determined the case on that point, dismissing the complaint without reaching the merits of the patent validity contest; this even though a full evidentiary hearing on patent validity had been completed.

■ It follows that the initial holding of the court so dismissing the complaint is contrary to the controlling law and must be reversed. On the teaching of *Lear,* I now hold that the plaintiff is not estopped to question the validity of defendant's Patent No. 3,193,300, issued by the Patent Office, July 6, 1965, and that I must proceed to deal with the issue of the validity of the patent. The collateral issue of the enforceability of the license agreement has been decided by the State Courts of the State of Idaho, which determination is res judicata as far as this case is concerned, and if the question was ever before me, it is now considered to be settled and no longer an issue in this cause.

Counsel have been consulted with fully and are satisfied with the evidence record each has made. Full evidence was heard on the issue of the validity of defendant's said patent; a transcript of the evidence has been recently reviewed by the court to refresh the mind of the trier of facts; briefs have been resubmitted and carefully perused; the matter is fully submitted and the court now makes the following Findings of Fact and Conclusions of Law:

## FINDINGS OF FACT

### I.

■ Plaintiff succeeded to a License Agreement entered into October 6, 1960, providing for royalty payments to defendant by plaintiff's predecessor, Edward L. Scott, for the manufacture, use, or sale of ski pole rings covered by defendant's Patent 3,193,300 issued July 6, 1965. Plaintiff ceased to pay royalties before the patent issued and has taken the position that the patent is invalid, not infringed, and that it has no obligation under the License Agreement. Before the present action, defendant brought suit in the Idaho State Court against plaintiff alleging that plaintiff was operating under the License Agreement. Inherent in that suit was the allegation that plaintiff was manufacturing, selling, and using ski pole rings covered by defendant's patent. An actual controversy exists between the parties.

### II.

In January of 1960, defendant conceived a self-affixing ski pole ring consisting of a rubber hub with integral radially projecting spokes quite similar to the device shown in Figure 9 of defendant's patent except that it did not have the metal reinforcing ring numbered 17B in the patent. Shortly before this, Scott had introduced to the market an improved ski pole having a special tapered construction which was an immediate success. McDonald approached Scott with his ring idea at the Winter Olympic Games at Squaw Valley, California, and Scott suggested that some sort of a rigid outer ring would be necessary in order for the device to be workable and that a three-spoked ring might be more pleasing in appearance. Scott and defendant kept in contact with one another re the development of such a ring, and by September, 1960 the ring had taken a form similar to that shown in Figures 1–4 of the McDonald patent. Scott then sent a drawing of his preferred ring shape to McDonald for the

purpose of McDonald having a suitable mold made for production thereof.

### III.

The patent application was filed in defendant's name in the Patent Office on January 25, 1961. The ski pole ring or basket shown in Figures 1–4 of the patent differs from that first model in that the reinforcing ribs 21 along the underside of the spokes or radial arms 20 illustrated in the patent were added at the suggestion and insistence of Scott because the spokes of the early production units were frequently tearing loose from the hub or the outer metal annulus.

### IV.

The ski pole rings sold by plaintiff since 1963 have been molded for it by the Reeve Rubber Company, in Southern California. This company had no difficulty in tooling up or producing the product and did so without any assistance from Scott or plaintiff, or from Redco or McDonald. The ski pole rings presently being manufactured for plaintiff corporation have not been modified in construction since the addition of the ribs on the underside of the radial arms which was made at Scott's suggestion and insistence.

### V.

Claim 3 of defendant's patent application recited that each of the radial arms 20 is "formed with a thickened portion at its outer end" and that there are "stiffening ribs extending along the arms between said hub and said thickened portion". These "stiffening ribs" have reference to the ribs 21 which were added at the suggestion and insistence of Scott. This claim 3 of the application was finally rejected by the Examiner and was one of the claims which was unsuccessfully appealed by the defendant to the Patent Office Board of Appeals by an appeal filed October 29, 1963. On page 9 of his appeal brief filed December 23, 1963, defendant alleged as follows:

"Voster does not teach or in any way suggest applicant's novel self attaching principle in which the enlarged central hub is diametrically expanded as the ski pole shaft is inserted therethrough. As explained in applicant's specification, this diametrical expansion of the central hub has a tendency to cause the annular ring to flop about loosely on the radially extending arms. This can be avoided either by pretensioning the arms in the manner described in the application and claimed in certain claims in this case which have been allowed, or by stiffening the arms through the use of stiffening ribs as defined in claim 3, or by a combination of both pretensioning and stiffening the arms.

"Under some conditions of use, the stiffening ribs may be sufficient to prevent excessive flopping action and applicant is clearly entitled to protect this feature in combination with his novel self-attaching structure. Co-action is clearly present between the stiffening ribs and the other recited structure because it is the diametric expansion of the hub which makes the stiffening function for the purpose described. Voster does not contemplate any diametrical expansion of the hub portion of his basket ring and accordingly cannot be said to teach the use of stiffening ribs in combination with a diametrically expanding central hub. Claim 3 should be allowed."

### VI.

All of the claims in the patent in suit were allowed by Examiner before the appeal filed October 29, 1963. Claim 3 of the patent was claim 8 of the application, and differs from claim 3 of the application only in that instead of including the stiffening ribs along the radial arms it states that the arms are "under tension whereby the arms will remain taut when said hub is expanded radially by mounting on a ski pole". This limitation is also found in claims 2, 4, and 6 of the patent. Tensioning of the arms if present in a particular case, is a re-

sult of the shrinkage of the rubber during cooling after removal of the rings from the molds in which they are formed under heat and pressure. This shrinkage is a natural and unavoidable characteristic of rubber when so molded as was explained by plaintiff's expert witness, and this characteristic has been well known in the rubber molding art long before 1960.

## VII.

During the prosecution of his application in the Patent Office, defendant filed an amendment on December 15, 1961, in which he alleged (p. 27, lines 18–21, of the file wrapper) that the "shrinkage of the material was related to the amount of expansion of the hub in such manner as to keep the arms under tension even after the hub was in place on the ski pole shaft". This amount of shrinkage is not present in the Scott ski pole rings as normally used, and this is evidenced by the fact that when a Scott ring is forced onto a ski pole shaft, the outer metal annulus of the ring moves somewhat axially of the shaft relative to the hub of the ring so that the radial arms, reinforced by the stiffening ribs, will not have to shorten as much as the radial expansion of the outside dimension of the hub.

## VIII.

Claim 7 of the patent in suit was claim 17 of the application, and recites that the metal annulus is "flattened" and that each of the radial arms terminates in a "rounded lobe extending radially past said annulus". On page 30, lines 11–14, of the file wrapper defendant stated:

"Claim 17 is directed to the structure illustrated in Figures 5 through 8 of the drawings wherein the arms extend past the metal annulus and terminate in outwardly rounded lobes."

These "rounded lobes" therefor have reference specifically to the portions 22 shown in Figures 5–8 of the patent, and do not refer to the enlarged portions surrounding the metal annulus at the outer ends of the radial arms 18–20 in Figure 1–4 of the patent. The same is true of the term "rounded lobe" appearing in claim 1 of the patent. None of the ski pole rings produced by or for Scott, plaintiff or defendant have incorporated a "rounded lobe" in the sense that the term is used in claims 1 and 7 of the patent.

## IX.

The ski pole rings shown in Figures 5–8 and in Figures 9–11 of the patent in suit have never been manufactured.

## X.

In his patent, defendant indicates in Column 1, lines 60–65, Column 2, Lines 61–65, that the rubber hub of the ring will grip the ski pole shaft so securely that no stop or other auxiliary fastening devices are required to secure the ring in the desired position axially of the pole. The patent drawing does not illustrate any stop in the tapered ski pole shaft. In the use of defendant's ski pole rings, a metal stop is first forced onto the tapered ski pole shaft to limit upward movement of the ring on the shaft, and this is necessary to make the device operable, as can be seen by comparison of plaintiff's Exhibit 53 which has no stop, with plaintiff's Exhibit 51–A which contains the usual metal stop.

## XI.

Molded rubber VIBRAM ski pole rings were in public use and sold in the United States prior to 1960 (plaintiff's Exhibit 3). These rings had an outer rigid metal annulus covered with rubber, a rubber hub, and integral rubber radial arms or spokes extending from the hub to the annulus and were made in various sizes.

## XII.

Self-affixing rubber grommets to retain ski pole rings against a stop located on a ski pole shaft by bearing against the hub of the ring were in public use and sold in the United States prior to 1960 (plaintiff's Exhibit 19) and writ-

ten instructions (plaintiff's Exhibit 48) for their use were distributed in the United States prior to 1960. Defendant admitted that such grommets were known to him prior to 1960 and may have given him the self-affixing idea for the hub of his ring. In practical effect defendant merely made the prior art (rubber grommets) an integral part of the ring.

## XIII.

The molded rubber FLEXO-RINGS were manufactured and sold in the United States prior to World War II (plaintiff's Exhibits 5, 6, 24 and 58), and it was common for racers in the United States to cut away the rubber from the outer metal annulus between the radial rubber arms to make the rings lighter (as illustrated in plaintiff's Exhibit 32). They were made in at least two (2) different sizes as illustrated by plaintiff's Exhibits 6 and 58.

## XIV.

A man typical of those having ordinary skill in the ski pole art in January, 1960 was one having had experience as a mechanic in a ski repair shop. Both Scott and defendant had ordinary skill in the ski pole art at the time the invention in suit was conceived.

## XV.

In view of the VIBRAM rings, the rubber retaining grommets, and the FLEXO-RINGS, all of which were in public use in the United States prior to the time that the invention in suit was conceived, the subject matter of the patent in suit would have been obvious to one having ordinary skill in the ski pole art at that time.

## XVI.

The VIBRAM rings, the rubber retaining grommets, and the FLEXO-RINGS with and without rubber between the radial arms, are not of record as prior art in the file wrapper (plaintiff's Exhibit 68) of the McDonald patent. They were made in at least three (3) sizes. See plaintiff's Exhibits 1 to 3 and defendant's Exhibit 75.

## XVII.

The gradual trend from World War II to 1960 was to make the ski pole rings smaller and lighter because of the development of packed snow conditions on ski slopes adjoining ski tows and changes in skiing techniques. Prior to 1960 there were ski pole rings in use as light in weight as the Scott rings sold by plaintiff and there were rings with three spokes. The size, weight, and number of spokes is a mere matter of choice.

## XVIII.

The radial arms in the molded rubber VIBRAM and FLEXO-RINGS were under tension before application to a ski pole shaft.

## XIX.

In the production of plaintiff's ski pole rings the tapered metal shafts are intentionally roughened in the area to be occupied by the hub of the ski pole ring so as to give an improved gripping action between the hub and the shaft.

## XX.

When a ski pole ring of the type in suit is removed from a ski pole shaft its hub does not shrink back to the same position and elastic state as it originally had. Therefore, plaintiff's employees found it necessary, when reusing the ski pole ring after replacing a damaged shaft on which the ring had been used, to apply an adhesive between the hub of the old ring and the new shaft.

## CONCLUSIONS OF LAW

### I.

This court has jurisdiction based on 28 U.S.C.A. § 2201 (Declaratory Judgments) and on 28 U.S.C.A. § 1338 (Patents, etc.).

### II.

Claims 1 through 7 of McDonald Patent No. 3,193,300 are invalid. The dif-

ferences between the subject matter defined by these claims and the prior art, the most relevant of which was not before the Examiner in the Patent Office, are such that the subject matter as a whole would have been obvious in January, 1960 to a person having ordinary skill in the ski pole art. 35 U.S.C.A. § 103.

### III.

Claims 2 through 6, inclusive, of the patent in suit, No. 3,193,300, are also invalid for the failure of these claims and the written description in the patent to meet the requirements of 35 U.S.C.A. § 112.

### ORDER

Counsel for plaintiff will prepare, serve and lodge with the Clerk a proposed form of Judgment compatible to the holdings and conclusions of the court and reflecting the dismissal of the estoppel issue, and non-consideration of the contract enforceability issue.

### JUDGMENT

This cause came on for trial before the court sitting without a jury, and the court being fully advised and having made findings of fact and conclusions of law on April 22, 1970, it is hereby

ORDERED, ADJUDGED AND DECREED as follows:

1. This court has jurisdiction based on 28 U.S.C.A. Sec. 1338 (Patents, etc.).

2. That plaintiff is not estopped to question the validity of defendant's Patent No. 3,193,300, issued by the Patent Office July 6, 1965.

3. That the issue of the enforceability of the license agreement has been decided by the State Courts of the State of Idaho which determination is res judicata.

4. That United States Letters Patent No. 3,193,300, issued July 6, 1965, to defendant, is invalid as to claims 1 through 7 thereof.

5. That the plaintiff have judgment against the defendant for the costs of this action. Taxed in the sum of $403.-58.